IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WMC MORTGAGE LLC | : | CIVIL ACTION |
| | : | |
| v. | : | No. 10-3118 |
| | : | |
| SARAH E. BAKER, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                              **February 28, 2012**

This case concerns the consequences of a lender's failure to honor a borrower's timely exercise of the right to rescind a mortgage refinancing loan under the Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq., more than six years ago.

The borrowers, Defendants Sarah and Eric Baker, rescinded the loan in question by sending a rescission notice to the lender, WMC Mortgage Corp. (WMC Corp.), within three business days of the loan closing, as permitted under TILA.  WMC Corp. received the rescission notice, but proceeded to fund the loan anyway and then sold it to a third party.  For their part, the Bakers made initial efforts to enforce their rescission by communicating with the broker of the loan, but when they began receiving communications about the debt from the loan's new servicer—which made clear the rescission had not been honored—they failed to respond.  The Bakers did not seek to enforce their rescission in court pursuant to TILA, although they had a right to do so and to recover damages for the lender's failure to honor the rescission.

When WMC Corp. reacquired the Bakers' loan within the first year after the closing, it also did not seek judicial intervention concerning its rights and obligations with respect to the rescission, but continued to ignore it.  Instead, the mortgage securing the loan was assigned to another party for the purpose of pursuing a foreclosure action, which the Bakers defended on the basis that the loan

had been rescinded.  Only after the foreclosure action was voluntarily discontinued without prejudice (for reasons that remain unknown) did WMC Corp.'s successor, Plaintiff WMC Mortgage LLC (WMC), bring the instant action to recover on the note, almost five years after the loan closing.

WMC sues the Bakers for declaratory relief and damages.  WMC seeks a declaration that if the Bakers rescinded the loan, they must return the loan principal to WMC, and if they did not rescind the loan, they are in breach of the note due to their failure to make any payments thereunder. In the event the Bakers did not rescind the loan, WMC seeks damages for breach of the loan or, alternatively, under a theory of unjust enrichment.

The Bakers contend their timely submission of a rescission notice voided the entire loan transaction and WMC's efforts to recover for breach of the loan are time-barred.  The Bakers also assert counterclaims against WMC for violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq., the Pennsylvania Fair Credit Extension Uniformity Act (FCEUA), 73 P.S. § 2270.1 et seq., TILA,  and the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 P.S. § 201-1 et seq., and to quiet title to and discharge all liens on their property at 6370 Del Haven Road, Bangor, Pennsylvania.

After a bench trial, this Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  Although this Court disagrees with the Bakers that WMC's claims are time-barred, for the reasons set forth below, the Court finds the Bakers rescinded the loan and the rescission should be enforced pursuant to TILA's default procedures.  As a result, the Court will order WMC to terminate its security interest in the Bakers' property, following which the Bakers must return to WMC the principal amount of the loan, less any finance or other charges disallowed under TILA.  Because this Court concludes WMC violated both TILA

and the UTPCPL by failing to honor the Bakers' timely submitted three-day rescission notice, the Court will also award statutory and actual damages to the Bakers. Finally, consistent with the Court's conclusion that WMC must terminate its security interest in the Bakers' property under TILA, the Court will also enter judgment for the Bakers on their quiet title counterclaim.

## FINDINGS OF FACT

In June 2005, the Bakers borrowed $155,600.00 from WMC Corp. to refinance the existing mortgage on their home, which was held by USAA Federal Savings Bank (USAA). The Bakers arranged the loan via telephone through a mortgage broker, First Guarantee.[1] At the time of the transaction, the Bakers owed $91,947.42 on their mortgage loan from USAA, and owed $18,919.00 on a home equity loan from Equity One.

The closing for the WMC Corp. loan was held at the Bakers' home on the evening of June 3, 2005, a Friday. The closing was conducted by Ralph Lewis, whom the Bakers believed was representing First Guarantee, although he was not the person with whom they had arranged the loan. Mrs. Baker signed the loan application at the closing. She also signed an Adjustable Rate Note (the Note) in favor of WMC Corp. secured by a mortgage (the Mortgage) on the Bakers' home. Both Mr.

---

[1] The precise identity of the Bakers' mortgage broker is not clear from the record. On June 3, 2005, Mrs. Baker signed a Mortgage Brokerage Business Contract and Mortgage Loan Origination Agreement with Saratoga First Guarantee Funding. Ex. P-21. According to Diane Taylor, WMC's Assistant Vice President of Operations, however, the broker for the Bakers' loan was First Guarantee Mortgage, LLC. Tr. vol. 1, 87, Feb. 8, 2011; Ex. P-24 (Broker Origination Agreement between WMC Corp. and First Guarantee Mortgage, LLC). The solicitation Mrs. Baker identified as having led her and her husband to First Guarantee was from First Guaranty Mortgage Corporation. Ex. D-4. Because it is not necessary to determine whether Saratoga First Guarantee Funding, First Guarantee Mortgage, LLC, and/or First Guaranty Mortgage Corporation are the same entity, the Court will simply refer to the broker as First Guarantee.

and Mrs. Baker signed the Mortgage securing the loan.[2]

The Note obligated Mrs. Baker to make monthly payments of principal and interest to WMC Corp. in the initial amount of $995.33.  For the first two years of the loan, the interest rate was fixed at 7.25 percent annually; however, beginning in July 2007, the interest rate was subject to change every six months, up to a maximum of 13.75 percent.

At the closing, Lewis provided the Bakers with numerous documents, including a pre-printed "Notice of Right to Cancel," which advised the Bakers of their right under federal law to cancel the transaction within three business days from the date of the transaction and further advised:

> If you cancel the transaction, the mortgage/lien/security interest is also cancelled.  Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given us or to anyone else in connection with this transaction.
>
> You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property.  If it is impractical or unfair for you to return the property, you must offer its reasonable value.  You may offer to return the property at your home or at the location of the property.  Money must be returned to the address below.  If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

Ex. D-1. The Bakers reviewed the loan documents during the weekend following the closing and decided they did not want to go through with the loan because of the variable interest rate after the first two years.  On Tuesday, June 7, 2005, Mrs. Baker signed and dated the Notice of Right to Cancel under the words "I WISH TO CANCEL."  *Id.*  She mailed the Notice of Right to Cancel to WMC Corp. at the Burbank, California, address provided on the form the same day.  *Id.*

---

[2] The Mortgage conveyed the Bakers' residence to the Mortgage Electronic Registration Systems, Inc. (MERS), solely as nominee for WMC Corp. and its successors and assigns.  Ex. P-12.

Although WMC Corp. received the signed Notice of Right to Cancel, it did not cancel the transaction but instead proceeded to fund the loan.  On June 15, 2005, after receiving the Notice of Right to Cancel, WMC Corp. wired $155,484.78 to its settlement agent, Industry Partners Title, LLC (Industry Partners), for disbursement.  Tr. vol. 1, 90-91; Ex. P-16A.

At trial, Diane Taylor testified she thought WMC Corp. had reason to believe the Bakers wanted to proceed with the loan at the time WMC Corp. funded it, notwithstanding their cancellation notice, but there is no evidence the Bakers ever communicated such a desire to anyone.  Taylor explained WMC's practice upon receiving a cancellation notice was to contact the broker, who typically had the relationship with the borrower, so the broker could clarify whether the borrower wanted to move forward with the loan.  Tr. vol. 1, 97-99, 130.  However, Taylor conceded she does not have personal knowledge of any communications between WMC Corp. and First Guarantee about the Bakers' loan, *id.* at 148, 152, and no evidence of such communications was admitted at trial.[3]  Moreover, Mrs. Baker denied ever telling anyone at First Guarantee or WMC Corp. she wanted to "undo" her cancellation of the loan transaction.  Tr. vol. 2, 160, Feb. 9, 2011.  The Court finds Mrs. Baker's testimony on this issue credible.  Thus, the Court finds WMC Corp. did not have reason to believe the Bakers wanted to proceed with the loan at the time it funded the loan.

---

[3] The only evidence WMC even attempted to offer regarding any such communications was a June 2007 email exchange between Anthony Rega, a WMC Corp. business development representative, and Laurie Brown, an employee of First Guarantee, in which Rega asked Brown for information regarding the Bakers' loan, which WMC Corp. was being asked to buy back.  Ex. P-15.  Rega stated "[a]pparently this borrower sent in a [rescission] notice and then changed [her] mind and we funded," but also noted he did not have "the email chain to see what happened since it was back in 2005." *Id.*  Brown did not recall the loan, but indicated she would "check with sales and processing and see if anyone remembers anything about [the loan]." *Id.*  The foregoing email exchange was excluded as hearsay.  Tr. vol. 1, 96.  Even if the exchange had been admitted, however, it does not support WMC's position because it at best reflects Rega's unfounded speculation that Mrs. Baker changed her mind about the rescission before WMC funded.

About two weeks after the June 3 closing, the Bakers received a Federal Express package containing six checks from Industry Partners dated June 15, 2005.  The checks sent directly to the Bakers accounted for about $28,000 of the loan proceeds.  Four of the checks were made out to creditors of the Bakers, one check was made out to the Bangor Area School District, and one check was made out to Mrs. Baker personally.[4]  The Bakers did not cash or send on to their creditors any of the checks they received from Industry Partners in June 2005.[5]

Industry Partners disbursed the balance of the loan proceeds directly to the Bakers' remaining creditors.  Industry Partners sent checks in the amounts of $91,947.42 and $18,919.00, both dated June 15, 2005, to USAA and Equity One, respectively.  *See* Tr. vol. 2, 218; Defs.' Notice of Lodging of Originals of Trial Ex. P-8C (ECF No. 61) (June 8, 2005, cover letter from Industry Partners enclosing checks indicating "[t]he checks for any mortgages you are paying off have been sent

---

[4] The checks sent to the Bakers included (1) a check for $18,383.76 payable to Mrs. Baker, (2) a check for $8,228.00 payable to American Express, (3) a check for $733.08 payable to Bangor Area School District, (4) a $59.00 check payable to CBUSASEARS, (4) a $95.00 check payable to Kohls, and (6) a $23.00 check payable to MBNA America.  Ex. P-8C.

[5] WMC speculates the Bakers attempted to send these checks to their creditors who, in turn, were unable to apply the funds to the Bakers' accounts because the account numbers were not written on the checks, Tr. vol. 2, 276, but there is no evidence to support this theory.  To the contrary, following trial, the Bakers lodged the original checks with the Clerk of Court, thereby establishing that they in fact kept the checks.  Although WMC objects to the post-trial lodging of the checks as procedurally improper, WMC does not suggest it would be unduly prejudiced by the Court's consideration of this evidence, which WMC characterizes as "legally and factually irrelevant." WMC's Mar. 22, 2011, letter regarding Defendants' Notice of Lodging (ECF No. 63).  WMC apparently had not previously seen the cover letter that accompanied the checks Industry Partners sent to Mrs. Baker; however, WMC does not contend the cover letter was improperly withheld during discovery.  Indeed, it is not clear to what extent the parties pursued discovery in this case. *See* Defs.' Mot. for Leave to File Second Am. Answer ¶ 14 (ECF No. 20) (noting no discovery had taken place as of November 18, 2010).  In these circumstances, the Court will consider the original documents lodged with the Clerk of Court. *See Gibson v. Mayor of Wilmington*, 355 F.3d 215, 229 (3d Cir. 2004) (noting a district court is accorded "[g]reat flexibility . . . in its determination to supplement the record" so long as the court does not "perpetrate[] any type of injustice in so doing").

directly to your mortgage company(s)"); Ex. P-8D. About two weeks later, on June 30, 2005, Industry Partners issued two checks to the County of Northampton, one in the amount of $791.97 and the other in the amount of $4,327.81. Ex. P-8D. It appears Industry Partners sent these checks directly to the County, as Mrs. Baker testified she did not receive the checks or send them to the County, but saw them for the first time when they were produced to her lawyer in 2009 in connection with the foreclosure proceedings in state court. Tr. vol. 2, 207-08.

In late-June, having received the checks from Industry Partners, and having heard nothing from WMC Corp. in response to her cancellation notice, Mrs. Baker called First Guarantee and spoke with either Stacy or Clarissa about the rescission, asking whether the Bakers should return the checks. Mrs. Baker made additional calls to First Guarantee about the rescission and faxed the Notice of Right to Cancel to First Guarantee, which was unaware of the Notice.[6] She did not contact WMC Corp. about the rescission after mailing the Notice of Right to Cancel. Tr. vol. 1, 210-11.

On July 29, 2005, WMC Corp. sold the Bakers' loan to Goldman Sachs for $159,999.47. Tr. vol. 1, 106-07; Ex. P-16B. In September 2005, Litton Loan Servicing (Litton) began servicing the loan, which was already past due. Tr. vol. 1, 48. Litton thereafter attempted to contact Mrs. Baker about the loan by mail and by phone.

On September 26, 2005, Litton sent Mrs. Baker a "Validation of Debt Notice," notifying her that Litton was collecting a $158,343.76 debt she owed to Goldman Sachs Whole Loans, and

---

[6] Mrs. Baker testified she placed between seven and fifteen calls to First Guarantee in an effort to effectuate the cancellation, including calls made on June 24 or 25, 2005, and June 27, 2005. Tr. vol. 2, 163, 168, 176. Although the Court credits Mrs. Baker's testimony that she contacted First Guarantee about the rescission, the Court does not find Mrs. Baker's testimony regarding the number of communications credible given the lack of explanation of the purpose or result of the communications and the absence of any notes or other documents regarding the communications.

advising that Litton would assume the debt to be valid unless she disputed its validity within 30 days. Ex. P-14A. Mrs. Baker did not respond to the notice. Tr. vol. 1, 35, 211.

Also in September 2005, Litton began calling the Bakers regarding the loan at their home. Between September 2005 and June 2007, Litton placed more than 100 calls to the Bakers' home, but never spoke with anyone.[7]

In October 2005, Litton sent Mrs. Baker a "Notice of Default and Intent to Accelerate" and the "Act 91 Notice" required under Pennsylvania law. The Notice of Default stated Mrs. Baker's mortgage loan was in default and advised that, to cure the default, she would have to pay the $3,085.53 then due and owing on her note and mortgage. Ex. P-14B. The letter also advised Mrs. Baker that failure to cure the default within 45 days would result in acceleration of the maturity date of the note and referral of the property for foreclosure. *Id.* The Act 91 Notice advised Mrs. Baker of the default, how to cure it, and the consequences should she fail to cure it, and provided information regarding the Homeowner's Emergency Mortgage Assistance Program. Ex. P-14C. In addition, Litton sent Mrs. Baker other communications regarding the loan, including billing statements and letters regarding a possible foreclosure in November and December 2006 and January 2006. Exs. P-14D to P-14H; Tr. vol. 1, 39-43.

--------

[7] According to Litton's call records, in most instances, either Litton's calls were not answered or Litton left a message requesting a call back, although on some occasions someone answered the phone but then hung up. Mrs. Baker denied ever hanging up on a call when there was an actual person on the line, but acknowledged she may have hung up when the caller did not speak immediately, as happens when a call is being switched from an auto-dialing system to a person. Tr. vol. 1, 219-20; *see also id.* at 58-59 (acknowledging that Litton uses an auto-dialer system, which switches a call to a Litton representative after the phone is answered, sometimes resulting in a delay). Mrs. Baker also recalled receiving messages in which the caller requested a call back about an "important matter"; however, the caller did not identify himself or ask for Mrs. Baker by name. *Id.* at 218.

Although Mrs. Baker did not recall receiving any particular notice from Litton, Mr. Baker acknowledged he and his wife received letters from Litton claiming they owed a debt on their home. The Bakers kept the letters in a file, recognizing they might be important, but did not respond to any of them, as they had sent their rescission notice to WMC and had communicated about the matter with the broker, and they did not believe they had any business with Litton.  Tr. vol. 1, 211, 214-16, 252-54, Tr. vol. 2, 3-4.

In March 2006, Industry Partners issued a series of new checks to four of the Bakers' creditors.  Ex. P-8D.  These new checks were written to the same creditors, in the same amounts, as the checks Industry Partners had previously issued on June 15, 2005.  *Id.*  Unlike the June 2005 checks, which were sent to the Bakers, who kept them, the March 2006 replacement checks were sent to the creditors, who cashed them.[8]

In April 2006, Mr. Baker spoke with Clarissa from First Guarantee, who threatened to put a "lockbox" on the Bakers' house.  Tr. vol. 2, 4, 177, 180.  Thereafter, on April 19, 2006, Mrs. Baker faxed a copy of the Notice of Right to Cancel she had signed on June 7, 2005, to Dave Skinner, Vice President, Credit and Operations, at First Guarantee.  Tr. vol. 2, 177, 180-81; Ex. D-5.  The fax referenced the "difficult time" the Bakers had experienced in working with First Guarantee and expressed Mrs. Baker's hope that communication with Skinner would "continue until things are

---

[8] Although WMC speculates the March 2006 checks were initially sent to the Bakers, who handwrote their account numbers on the checks and then forwarded them to the their creditors, there is no evidence this is true.  The Bakers denied ever receiving the March 2006 checks, and did not recognize the handwriting on the checks.  Tr. vol. 2, 10, 13-16, 209, 213, 216, 220.  In addition, Mrs. Baker testified she had already paid the amount owed on two of the accounts (Sears and Kohl's) by the time the replacement checks were issued, so that when these creditors cashed the replacement checks, she received a credit on her account in the amount of the check.  *Id.* at 213-14, 216.  Finally, the account numbers on the replacement checks do not all appear to be in the same handwriting, suggesting the account numbers were not written by the same person.

resolved."  It does not appear, however, that the Bakers had any further interactions with Skinner.[9]

On April 22, 2006, WMC Corp. repurchased the Bakers' loan from Goldman Sachs for $164,985.57.  Tr. vol. 1, 107, 109; Ex. P-16C.  Taylor testified WMC Corp. was required to buy the loan back for "early payment default" because it was not performing.  Tr. vol. 1, 109, 158-59.

Although WMC had repurchased the Bakers' loan less than ten days earlier, on May 1, 2006, Deutsche Bank National Trust Company (Deutsche Bank), "as Trustee under the Pooling and Servicing Agreement dated as of September 1, 2005, GSAMP TRUST 2005-WMC,"[10] filed a foreclosure action against the Bakers in the Northampton County Court of Common Pleas.  Ex. D-6. The foreclosure complaint alleged Deutsche Bank was the legal owner of the Bakers' Mortgage and was in the process of formalizing an assignment of the Mortgage from MERS, as nominee for WMC Corp.,[11] and sought an *in rem* judgment in the amount of $167,107.49 based on the Bakers' failure to make mortgage payments.  *Id.*  The Bakers hired an attorney to represent them in the foreclosure action, which they defended at least in part on the ground they had rescinded the transaction, thereby voiding the Mortgage.

On June 2, 2006, while the foreclosure action was pending and after the Bakers' Mortgage

---

[9] Although it is not clear what, if any, action Skinner took in response to the Bakers' rescission notice, Mrs. Baker testified she and her husband received a phone message from a WMC Corp. representative named Robert a few weeks after she faxed the rescission notice to Skinner.  Tr. vol. 2, 186.  By that time, the Bakers were represented by counsel in connection with a foreclosure action that had been initiated, and their attorney advised them to direct any calls from WMC to him.  *Id.*

[10] The GSAMP Trust is a securitization trust created by Goldman Sachs.

[11] On May 23, 2006, MERS assigned the Bakers' Mortgage to Deutsche Bank.  Ex. D-14 (ECF No. 64).  The assignment, which purported to assign the Mortgage, "together with the Note and indebtedness therein mentioned," was thereafter recorded with the Northampton County Recorder of Deeds on October 23, 2006.  *Id.*

was assigned to Deutsche Bank, WMC Corp. sold the Bakers' loan to GMAC for $156,705.00, later

repurchasing the loan from GMAC on October 5, 2007, for $182,193.45.  Tr. vol. 1, 109-12, 161,

166-67; Exs. P-16D to P-16I.[12]  Taylor did not know why WMC Corp. repurchased the loan, Tr. vol.

1, 170; however, she testified WMC Corp. (or WMC) had owned the loan continuously following

the second repurchase on October 5, 2007, *id.* at 113, 169.[13]

In May 2007, also during the pendency of the foreclosure action, Industry Partners issued a

check to Mrs. Baker in the amount of $733.08 bearing the handwritten notation, "2005 school taxes

paid."  Ex. P-8D.  Industry Partners had previously sent Mrs. Baker a check payable to the Bangor

Area School District in the same amount in June 2005; however, Mrs. Baker did not forward the

check to the School District, but instead paid the school taxes herself.  The May 2007 check thus

---

[12] Taylor identified the entity to which WMC sold the loan on June 2, 2006, as "GMAC-non-performing," and identified the entity from which WMC repurchased the loan on October 5, 2007, as "GMAC ResCap."  Tr. vol. 1, 161-62, 166-67.  It is not clear whether these entities are the same.

[13] According to Taylor, WMC came to own the Bakers' loan through a corporate reorganization in which WMC Corp. merged into "WMC Finance," and was then renamed WMC Mortgage LLC in December 2007.  Tr. vol. 1, 77-79.  Taylor explained WMC is currently winding down its business, and the few employees left at WMC are former employees of WMC Corp.  *Id.*  Although the Bakers do not dispute that WMC is the successor in interest to WMC Corp., Defs.' Proposed Findings 30, ¶ 113, they challenge Taylor's account of the reorganization based on records from the Delaware Department of State, Division of Corporations, regarding the status of WMC Corp., WMC, and an entity named "WMC Financial Corporation," *id.* 11, ¶ 56.  The Bakers argue these records contradict Taylor's explanation because they reflect that WMC pre-existed the creation of "WMC Financial Corporation," which was not incorporated until 2007.  *See* Exs. D-13a (listing a February 1997 formation date for WMC Mortgage, LLC), D-13b (listing a May 2007 incorporation date for WMC Financial Corporation).  Insofar as the Bakers rely on records regarding "WMC Financial Corporation," it is not clear such records are relevant because the entity Taylor identified as WMC Corp.'s parent company is "WMC Finance," not "WMC Financial Corporation."  Tr. vol. 1, 77; *see also* Taylor Aff. ¶ 7 (ECF No. 32) (stating WMC Corp. was merged with its parent corporation, WMC Finance Co., in 2007).  The records produced by the Bakers do suggest WMC was formed prior to the 2007 reorganization described by Taylor, but it remains undisputed that WMC is the successor in interest to WMC Corp.

11

appears to have been sent to Mrs. Baker to reimburse her for the school taxes the June 2005 check

was intended to cover.[14]  *See* Tr. vol. 1, 223, vol. 2, 203-05.  Mrs. Baker cashed the $733.08 check

on the advice of her counsel in the foreclosure action.  She also cashed a replacement check Industry

Partners had issued for the $18,383.76 check that Mrs. Baker had received but never cashed in June

2005,[15] again doing so on the advice of counsel.  Tr. vol. 1, 222.  The Bakers used the funds to pay

their counsel in the foreclosure action and other unrelated expenses.  The Bakers' paid about $6,500

in legal fees in defending the foreclosure action.  Tr. vol. 2, 191.

In January 2009, after settlement discussions proved unsuccessful,[16] Deutsche Bank filed a

motion for summary judgment in the foreclosure action, which was denied in April 2009.  Ex. D-7.

A year later, on May 19, 2010, Deutsche Bank voluntarily withdrew the foreclosure complaint

without prejudice.  Ex. D-8.  The reasons for the withdrawal are not clear from the record.

On June 28, 2010, a month after Deutsche Bank withdrew its foreclosure action, WMC filed

the instant action to recover the funds it loaned to the Bakers, bringing claims in the alternative for

declaratory relief, breach of contract, and unjust enrichment.  WMC seeks a declaratory judgment

that if the Bakers rescinded the loan pursuant to TILA, 15 U.S.C. § 1635, they must return to WMC

---

[14] Mrs. Baker testified she believed Industry Partners had attempted to pay the school taxes directly before issuing the reimbursement check to her because Industry Partners had previously made property tax payments directly to Northampton County on her behalf such that when Mrs. Baker attempted to pay her taxes, she received a refund from the County.

[15] It is not clear when this replacement check was issued.

[16] In April 2008, Deutsche Bank advised the Bakers' counsel the mortgage servicer would be willing to allow rescission "in exchange for receiving all principal minus the fees and costs incurred in the refinancing," and would consider modifying the mortgage loan if the Bakers were not able to tender back the $152,300.52 amount calculated by Deutsche Bank.  Ex. P-8C.  This offer apparently was not accepted.

12

the loan funds minus the fees and costs incurred in the closing of the loan, or property of equivalent value, and if the Bakers did not rescind the loan, then the loan remains in effect and the Bakers are in breach of the Note due to their failure to make any of their required monthly payments.   In the event the Court determines the Bakers did not rescind the loan, WMC seeks damages for the Bakers' breach of the loan or, alternatively, under a theory of unjust enrichment.   Although the Bakers initially defended the case pro se, counsel appeared for the Bakers on November 16, 2010, two weeks before the November 30, 2010, discovery deadline.   The case proceeded to a non-jury trial in February 2010.

On February 25, 2011, after the conclusion of the trial, WMC transferred the Bakers' loan to GE Money Mortgage Holding Co. (GEMMHC), another entity owned by General Electric Capital Corporation, WMC's parent company.   Lee Aff. ¶ 7 & Ex. A (ECF No. 69).   GEMMHC notified the Bakers of the transfer in April 2011.

## CONCLUSIONS OF LAW

### A.   WMC's Claims

As a threshold matter, this Court must address the Bakers' challenge to WMC's standing to pursue this action to enforce the Note.   Although the Bakers admitted in all three iterations of their Answer, and again at trial, that "WMC is the current owner of the Loan," the Bakers now question whether this is true.[17]   At trial, WMC introduced WMC Corp. business records reflecting WMC

---

[17] Ordinarily, admissions in pleadings are binding on the party making them and prevent the party from later taking a contrary position in the same litigation.   *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 181 (3d Cir. 2008); *see also Parilla v. IAP Worldwide Servs. VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004) (holding a district court need not make specific findings as to facts expressly conceded in the complaint).   Where such admissions go to the court's subject matter jurisdiction, however, this principle does not apply.   *See Rubin v. Buckman*, 727 F.2d 71, 72 (3d Cir. 1984) (holding a plaintiff could not be estopped from denying his original allegation of Hong Kong

Corp.'s sales and repurchases of the Bakers' loan.  Diane Taylor testified the records show that

WMC Corp. initially sold the loan to Goldman Sachs on June 29, 2005, repurchased the loan from

Goldman Sachs for "early payment default" on April 22, 2006, resold the loan to GMAC on June

2, 2006, and again repurchased it on October 5, 2007.  Taylor also explained when a loan is sold, the

loan file is transferred to the purchaser.  Tr. vol. 1, 154; *see also* Lee Aff. ¶ 6 (ECF No. 69) (stating

each transaction in which WMC Corp. sold or repurchased the Bakers' loan "included the transfer

of the Loan file").  Taylor further explained WMC came to own the Note as WMC Corp.'s

successor, through a corporate reorganization in December 2007, following which WMC owned the

loan continuously until February 2011, when it was transferred to GEMMHC.

After trial (and after the parties submitted proposed findings of fact and conclusions of law),

the Bakers sought permission to supplement the trial record with a certified copy of the May 23,

2006, Assignment of Mortgage in which MERS assigned the Bakers' Mortgage to Deutsche Bank.[18]

The Bakers argue the Assignment, which purports to assign the Mortgage, "together with the Note

and indebtedness therein mentioned," casts doubt on Diane Taylor's testimony that WMC

repurchased the loan from Goldman Sachs the previous month, on April 22, 2006, and on WMC's

standing to proceed with this case.

---

citizenship, on which diversity jurisdiction was based, even where the plaintiff denied such
citizenship only after he received an adverse summary judgment ruling, as "subject matter
jurisdiction can never be created by estoppel").

[18] The Assignment of Mortgage was part of the record in the state court foreclosure action, as
Deutsche Bank submitted it as an exhibit to its motion for summary judgment in that action.
Although not admitted at trial, Deutsche Bank's summary judgment motion in the foreclosure action
and the exhibits thereto, including the Assignment of Mortgage, were part of WMC's trial exhibits
in this case.  Thus, while the Bakers contend the Assignment was "newly discovered" after trial, in
fact, this document was provided to their foreclosure counsel in January 2009 and to their current
counsel just prior to the trial of this case.

As an initial matter, the Assignment of Mortgage cannot have affected WMC Corp.'s ownership of the Note because there is no evidence MERS has ever had any rights in the Note, and MERS therefore could not legally assign the Note.  Under Pennsylvania law, "[a] mortgage and an accompanying note are separate obligations.  The note is evidence of the debt; and the mortgage provides collateral security for the debt." *Courtney v. Ryan Homes, Inc.*, 497 A.2d 938, 942 (Pa. Super. Ct. 1985).  Although the Mortgage identifies MERS as the mortgagee solely in its capacity as nominee for WMC Corp. and its successors and assigns, with the right "to foreclose and sell the Property" and "to take any action required of [WMC Corp.] including, but not limited to, releasing and canceling this Security Instrument," Ex. P-12, the Note itself does not mention MERS.  Nor is there any evidence the Note was ever assigned to MERS.  In the absence of such evidence, any purported assignment of the Note by MERS would be ineffective.  *See In re Lippold*, 457 B.R. 293, 297-99 (S.D.N.Y. 2011) (holding an assignment of mortgage in which MERS, as the lender's nominee, purported to assign a mortgage and note did not give the assignee any rights in the note where there was no evidence MERS had any legal rights with respect to the note); *Bank of N.Y. v. Silverberg*, 926 N.Y.S.2d 532, 538-39 (N.Y. App. Div. 2011) (holding designation of MERS as lender's nominee and as mortgagee did not give MERS the power to assign the note secured by the mortgage absent evidence MERS was ever the lawful holder or assignee of the note).

This Court also rejects the Bakers' argument that the Assignment of Mortgage warrants a finding that WMC Corp. did not repurchase the loan from Goldman Sachs in April 2006.  It appears from the record the Assignment of Mortgage was executed to permit Deutsche Bank to pursue the foreclosure action in state court.  The foreclosure complaint alleged Deutsche Bank was the "legal owner" of the Bakers' mortgage and was "in the process of formalizing an assignment of same."  Ex.

D-6, ¶ 3.  And the Assignment of Mortgage was executed less than a month after the foreclosure action was filed.  Because there was no testimony at trial regarding the foreclosure action (or witnesses with knowledge of the action), it is not clear how or why Deutsche Bank was designated to pursue the foreclosure action, or when or why the action was ultimately discontinued.  In the absence of any evidence showing Goldman Sachs continued to own the loan after April 2006, however, this apparent incongruity is insufficient to undermine Taylor's testimony regarding WMC Corp.'s repurchase of the loan in April 2006.  The Court therefore finds the Assignment of Mortgage does not affect WMC's standing to pursue this action.

The Bakers also argue the "Notice of Sale of Ownership of Mortgage Loan" (Notice of Sale) they received in April 2011, notifying them of the transfer of their loan to GEMMHC, calls WMC's standing into question.  Specifically, the Bakers note that whereas Diane Taylor testified at trial that WMC Corp. repurchased the loan *from* GMAC on October 5, 2007, and thereafter held the loan continuously, the Notice of Sale states the loan "was initially sold *to* GMAC on [October 5, 2007], and was subsequently sold to [GEMMHC] on [February 25, 2011]."  Ex. D-15 (ECF No. 66) (emphasis added).  In response to the Bakers' motion to supplement the record with the Notice of Sale, WMC submitted an affidavit from Bennett W. Lee, a Senior Vice President of Operations at WMC who was involved in preparing the Notice of Sale, in which Lee explains the characterization of the loan as having been sold to GMAC on October 5, 2007, was a typographical error, and the Notice should have stated the loan had been sold to *WMC*.  Lee Aff. ¶ 10 (ECF No. 69).  Lee also explains that after he learned of the error, a corrected Notice of Sale was issued, stating the Bakers' loan "was sold to WMC on October 5, 2007 and was subsequently sold to [GEMMHC] on [February 25, 2011]."  *Id.* ¶ 11 & Ex. A.  Lee's affidavit and the corrected Notice of Sale, to which the Bakers

16

have made no objection, reinforce Taylor's testimony regarding WMC Corp.'s repurchase of the loan in October 2007; therefore, this Court finds the Notice of Sale does not cast doubt on WMC's standing to pursue this action.

Nor does the post-trial transfer of the Bakers' loan to GEMMHC prevent this Court from deciding this case on the merits. Under Federal Rule of Civil Procedure 25(c), if an interest in an action is transferred during the pendency of the litigation, "the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." The Rule thus "makes clear that in the absence of a motion to substitute, the action may properly continue by or against the transferor." *FDIC v. Deglau*, 207 F.3d 153, 159 n.2 (3d Cir. 2000). Here, neither party has sought to substitute GEMMHC as a party, and, in fact, GEMMHC's Chief Financial Officer has acknowledged GEMMHC is bound by the outcome of this lawsuit. Miguel Aff. ¶ 6 (ECF No. 68). Accordingly, the case may proceed between the existing parties, and this Court will turn to the merits of WMC's claims.

WMC's declaratory judgment claim seeks a declaration that if the Bakers rescinded the loan pursuant to TILA, they must return the loan funds or property of equivalent value to WMC, and if they did not rescind the loan, then the loan remains in effect and the Bakers are in breach due to their failure to make any of the required payments thereunder. The Bakers argue this claim is barred by the applicable statute of limitations, which they contend is four years, pursuant to 42 Pa. Cons. Stat. Ann. § 5525.

As both parties acknowledge, a declaratory judgment claim is subject to the same statute of limitations as the underlying legal claim on which the request for declaratory relief is based. *See Algrant v. Evergreen Valley Nurseries Ltd. P'ship*, 126 F.3d 178, 184 (3d Cir. 1997) (holding where

17

a claim for declaratory relief "could have been resolved through another form of action which has a specific limitations period, the specific period of time will govern" (quoting *Orangetown v. Gorsuch*, 718 F.2d 29, 42 (2d Cir. 1984))).  Here, the parties agree WMC's underlying legal claim sounds in contract.[19]  *See* Pl.'s Proposed Findings 14, ¶ 4 (arguing all of WMC's claims are subject to the applicable statute of limitations for breach of contract); Defs.' Proposed Findings 21, ¶ 84 (asserting "Count I . . . seeks a declaratory judgment predicated on a common law contract, implied contract or assumpsit claim").  They disagree, however, as to the appropriate contract-based statute of limitations.  WMC argues its request for declaratory relief is a claim to recover on the Note and is therefore subject to the 20-year statute of limitations set forth in 42 Pa. Cons. Stat. Ann. § 5529 because Mrs. Baker signed the Note under seal.  *See id.* § 5529(b)(1) (establishing a 20-year statute of limitations for "an action upon an instrument in writing under seal").  The Bakers argue the claim cannot arise under the Note because their rescission of the Note rendered it void, and the claim therefore arises under principles of promissory estoppel, implied contract, or unjust enrichment.  As a result, the Bakers contend the applicable statute of limitations is four years pursuant to 42 Pa. Cons. Stat. Ann. § 5525.  *See id.* (providing a four-year statute of limitations for actions upon a contract, a contract implied in law, or a negotiable or nonnegotiable note).

Because the declaratory judgment claim seeks a declaration regarding WMC's rights and obligations with respect to the Note, this Court agrees the claim is subject to the applicable statute of limitations for breach of contract.  While the Bakers' rescission of the loan may provide a defense to WMC's efforts to enforce the Note, the existence of such a defense does not alter the nature of

---

[19] Neither party contends WMC's declaratory judgment claim is a TILA claim.  Indeed, the Bakers have expressly asserted the declaratory judgment claim "is not a federal TILA claim."  Defs.' Reply Mem. in Supp. of Mot. for J. on the Pleadings 3 (ECF No. 39).

the claim as a claim for declaratory relief with respect to the Note, and thus does not affect the applicable statute of limitations.

Although an action on a note is generally subject to a four-year statute of limitations in Pennsylvania pursuant to 42 Pa. Cons. Stat. Ann. § 5525(a)(7), the statute of limitations is 20 years for "an action upon an instrument in writing under seal," *id.* § 5529(b)(1). Here, Mrs. Baker signed the Note directly under the pre-printed words, "WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED," Ex. P-10 at 4, creating a presumption the Note was signed under seal. *See Beneficial Consumer Disc. v. Dailey*, 644 A.2d 789, 790 (Pa. Super. Ct. 1994) ("[W]hen a party signs a contract which contains a pre-printed word 'SEAL,' that party has presumptively signed a contract under seal."). The Bakers presented no evidence to rebut this presumption; hence, the Court finds the Note was signed under seal. The Note also qualifies as an "instrument" for purposes of § 5529(b)(1) because it "defines the rights, duties, entitlements, and liabilities of the parties involved." *In re Estate of Snyder*, 13 A.3d 509, 513 (Pa. Super. Ct. 2011) (defining the term "instrument," for purposes of § 5529(b)(1), according to its *Black's Law Dictionary* definition, which lists a promissory note as an example of an instrument). Because the Note is an "instrument in writing under seal" within the meaning of § 5529(b)(1), the 20-year statute of limitations applies to WMC's declaratory judgment claim and the claim is therefore timely.

Whether the Note remains in effect depends upon whether the Bakers rescinded the Note pursuant to TILA, 15 U.S.C. § 1635, and the consequences of such rescission. Under § 1635, when a creditor retains or acquires a security interest in property used by the consumer as his principal dwelling, the consumer has the right to rescind the transaction until midnight of the third business day following the consummation of the transaction. *Id.* § 1635(a). This initial three-day period

during which the consumer may rescind the loan "is intended to provide a cooling off period during

which . . . consumers [can] change their minds . . . ." *Cappuccio v. Prime Capital Funding LLC*, 649

F.3d 180, 188 (3d Cir. 2011) (internal quotation marks and citations omitted); *see also* S. Rep. No.

96-368 (1979), *reprinted in* 1980 U.S.C.C.A.N. 236, 264 (stating TILA's rescission provision "was

enacted to give the consumer the opportunity to reconsider any transaction which would have the

serious consequence of encumbering the title to his home").  The consumer's right to rescind during

the first three business days after the loan closing is unconditional; the consumer may rescind the

loan "for any reason or for no reason."  *McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418,

421 (1st Cir. 2007); *see also Andrews v. Chevy Chase Bank*, 545 F.3d 570, 573 (7th Cir. 2008)

(recognizing a consumer may rescind a loan within the first three business days after the transaction

"for any reason whatsoever").  If the creditor fails to provide the consumer with the required notice

of the right to rescind or certain other material disclosures required under TILA, the rescission period

extends to three years.  *In re Porter*, 961 F.2d 1066, 1073 (3d Cir. 1992) (citing 12 C.F.R.

§ 226.23(a)(3)).

TILA also establishes a set of default procedures for unwinding a transaction when a

consumer has exercised the right to rescind:

> When an obligor exercises his right to rescind under [§ 1635(a)], he is not liable for
> any finance or other charge, and any security interest given by the obligor, including
> any such interest arising by operation of law, becomes void upon such a rescission.
> Within 20 days after receipt of a notice of rescission, the creditor shall return to the
> obligor any money or property given as earnest money, downpayment, or otherwise,
> and shall take any action necessary or appropriate to reflect the termination of any
> security interest created under the transaction.  If the creditor has delivered any
> property to the obligor, the obligor may retain possession of it.   Upon the
> performance of the creditor's obligations under this section, the obligor shall tender
> the property to the creditor, except that if return of the property in kind would be
> impracticable or inequitable, the obligor shall tender its reasonable value. . . .  If the

creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it.

*Id.*  These same procedures are reflected in the provisions of the Federal Reserve Board's "Regulation Z" implementing § 1635(b):

> (d) Effects of rescission.
>
> > (1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.
> >
> > (2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.
> >
> > (3) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section.  When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. . . . Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

12 C.F.R. § 226.23(d).  The default procedures set forth in the statute and regulation apply "except when otherwise ordered by a court."   15 U.S.C. § 1635(b); *see also* 12 C.F.R. § 226.23(d)(4) (providing TILA's rescission procedures "may be modified by court order").  Thus, although "[t]he rescission process is intended to be private, with the creditor and debtor working out the logistics of a given rescission, . . . [s]hould disagreements ensue or problems arise, either party may repair to a federal court."  *McKenna*, 475 F.3d at 421-22; *see also Andrews*, 545 F.3d at 574.

A consumer exercises the right to rescind by "notify[ing] the creditor of the rescission by

mail, telegram or other means of written communication."   12 C.F.R. § 226.23(a)(2); *see also* 15 U.S.C. § 1635(a) (providing a consumer shall have the right to rescind "by notifying the creditor, in accordance with regulations of the Board, of his intention to do so").   Where notification is by mail, "[n]otice is considered given when mailed."   12 C.F.R. § 226.23(a)(2).   Here, the loan closing occurred on Friday, June 3, 2005.   Because Sundays are not counted as a "business day" for purposes of TILA's rescission provision, *id.* § 226.2(a)(6), the third business day following the closing was Tuesday, June 7, 2005.   Thus, Mrs. Baker timely exercised the right to rescind by mailing a signed cancellation notice to WMC Corp. on Tuesday, June 7, 2005.

WMC argues the Bakers effectively reversed their rescission of the loan by accepting the benefits of the loan after submitting their rescission notice.   This Court disagrees.   As one court has noted in rejecting a similar argument, the fact that TILA itself does not provide for the revival of a rescinded transaction suggests "a rescission under [§ 1635(a)] is not subject to revival."   *Chapman v. Mortg. One Corp.*, 359 F. Supp. 2d 831, 833 (E.D. Mo. 2005); *see also Stump v. WMC Mortg. Corp.*, No. 02-326, 2005 WL 645238, at *10 (E.D. Pa. Mar. 16, 2005) (rejecting the argument a party can lose the right to rescind a contract if he engages in acts inconsistent with disaffirmance because the statutory right of rescission, if exercised, "voids the contract and makes later ratification legally impossible").   This conclusion is reinforced by Regulation Z, which requires a consumer's exercise of the right to rescind and any modification or waiver of such right to be in writing.   12 C.F.R. § 226.23(a)(2), (e)(1).   The requirement that notices with respect to rescission must be in writing suggests a borrower's conduct alone would be insufficient to undo a written rescission.   The regulation also affirmatively permits a consumer to retain any money or property received from the creditor pending the creditor's performance of its obligations with respect to unwinding the

transaction, *id.* § 226.23(d)(3), suggesting that the mere retention of the benefits of a loan is not sufficient to reverse a rescission.

Even if a consumer's conduct could reverse a rescission, as WMC contends, the Bakers' conduct is insufficient to do so in this case.  When the Bakers received checks from the settlement agent after WMC Corp. funded the loan notwithstanding their rescission, the Bakers did not cash the checks or send them on to their creditors, but instead held on to them and asked the settlement agent whether they should return the checks.  Although the settlement agent also paid off the Bakers' existing mortgage and home equity loans with the loan proceeds, the Bakers had no involvement in those payments, which the settlement agent sent directly to the lenders.  In May 2006, when Deutsche Bank initiated the foreclosure action, the Bakers produced their signed cancellation notice and defended the action based on their rescission of the loan.  While Mrs. Baker ultimately cashed two replacement checks issued by the settlement agent for checks she previously declined to cash, she did so in 2007, on the advice of her counsel in the foreclosure action, at a time when she was defending the foreclosure action on the ground that the loan had been rescinded.  In these circumstances, the Bakers' conduct is insufficient to reverse their rescission of the loan.

WMC also argues the Bakers' purported rescission of the loan is incomplete because they have not offered to return the loan proceeds.  Insofar as WMC argues TILA itself makes rescission conditional upon tender, this is incorrect.  As described above, the statute's default procedures expressly permit a borrower to effect a rescission of a loan without first returning the loan proceeds. *Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49, 55 (1st Cir. 2002).  Indeed, as numerous courts have recognized, "[t]he sequence of rescission and tender set forth in § 1635(b) is a reordering of common law rules governing rescission," which, by requiring the lender to tender first, "place[s] the

23

consumer in a much stronger bargaining position than he enjoys under the traditional rules of rescission." *Williams v. Homestake Mortg. Co.*, 968 F.2d 1137, 1140 (11th Cir. 1992) (internal quotation marks and citation omitted); *see also Large*, 292 F.3d at 55-56; *Palmer v. Ameribanq Mortg. Grp., LLC*, No. 05-2023, 2010 WL 3933273, at *21 (E.D. Pa. Oct. 6, 2010).  Although TILA gives district courts discretion to modify the default procedures specified therein in appropriate circumstances, absent court intervention, the statute's default procedures apply, and the borrower need not tender in order to rescind.  *See Yamamoto v. Bank of N.Y.*, 329 F.3d 1167, 1170 (9th Cir. 2003) (holding TILA's default sequence of rescission and tender "must be followed unless the court orders otherwise"); *Johnson v. Chase Manhattan Bank, USA, N.A.*, No. 07-526, 2007 WL 2033833, at *5 (E.D. Pa. July 11, 2007) ("It is apparent from the plain language of the statute that the borrower does not have to tender the proceeds of the loan before invoking her right to rescind unless and until a court decides otherwise and modifies the statutory scheme.").

Insofar as WMC asks this Court to exercise its discretion to condition rescission of the Bakers' loan on their tender of the loan funds in this case, there is a substantial question whether the Court continues to have such discretion where, as here, a rescission notice was mailed within the first three business days following the loan closing and the creditor received the notice but failed to respond.  As WMC suggests, § 1635(b) has been widely interpreted as giving courts discretion to condition rescission, including the voiding of the creditor's security interest, on the consumer's tender of the loan funds.  *See, e.g., Jobe v. Argent Mortg. Co., LLC*, 373 F. App'x 260, 262 (3d Cir. 2010); *Am. Mortg. Network, Inc. v. Shelton*, 486 F.3d 815, 820-21 (4th Cir. 2007); *Yamamoto*, 329 F.3d at 1171-73; *Decision One Mortg. Co., LLC v. Fraley*, No. 00-3270, 2000 WL 1889700, at *2 (6th Cir. Dec. 19, 2000); *FDIC v. Hughes Dev. Co., Inc.*, 938 F.2d 889, 890 (8th Cir. 1991); *Brown*

*v. Nat'l Permanent Fed. Savings & Loan Ass'n*, 683 F.2d 444, 447 (D.C. Cir. 1982); *cf. Williams*, 968 F.2d at 1140-42 (holding rescission under TILA is automatic upon notification, but a court may nevertheless "impose conditions that run with the voiding of a creditor's security interest upon terms that would be equitable and just to the parties in view of all surrounding circumstances").  Notably, the vast majority of cases—and virtually all of the appellate cases—addressing this issue involve a consumer's exercise of the right to rescind beyond the initial three-day cooling off period.  In most cases, the creditor disputed the availability of the extended rescission right.

The conclusion that rescission may be conditioned on tender is arguably in tension with the language of TILA, which provides that "[w]hen an obligor exercises his right to rescind under [§ 1635(a)], he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission."  15 U.S.C. § 1635(b); *see also* 12 C.F.R. § 226.23(d)(1) ("When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge."); 12 C.F.R. pt. 226, Supp. I ¶ 23(d)(1) ("Any security interest giving rise to the right of rescission becomes void when the consumer exercises the right of rescission.").  Nevertheless, courts have generally rejected the argument that submission of a rescission notice automatically voids the creditor's security interest and the loan agreement.  *See, e.g.*, *Shelton*, 486 F.3d at 821; *Yamamoto*, 329 F.3d at 1172; *Large*, 292 F.3d at 54-55.  In so holding, a number of appellate courts have reasoned the more natural reading of § 1635(b) "is that the security interest becomes void when the obligor exercises a right to rescind that is available in the particular case, either because the creditor acknowledges that the right of rescission is available, or because the appropriate decision maker has so determined." *Large*,

25

292 F.3d at 54-55; *see also Shelton*, 486 F.3d at 821; *Yamamoto*, 329 F.3d at 1172.  Under this view,

where the right to rescind is contested, "the designated decision maker . . . must decide whether the

conditions for rescission have been met," and "[u]ntil such decision is made, the [consumer] ha[s]

only advanced a claim seeking rescission."  *Large*, 292 F.3d at 55; *see also Shelton*, 486 F.3d at 821;

*Yamamoto*, 329 F.3d at 1172.[20]  As this Court recently recognized, the majority view that a loan

agreement is not voided immediately upon the creditor's submission of a rescission notice makes

sense, "particularly when such notice is sent more than three days after the transaction has been

finalized," as § 1635(b) "explicitly reference[s] the possibility of judicial intervention in the

rescission process," which could not occur if rescission became effective at the moment the

consumer gave notice.  *Beck v. Wells Fargo Bank, N.A.*, No. 10-4652, 2011 WL 3664287, at *3-4

(E.D. Pa. Aug. 19, 2011).

　　　　Here, however, the Bakers exercised their "unconditional" right to rescind the loan by

mailing their rescission notice to WMC on the third business day after the loan closing.  Although

WMC received the Bakers' rescission notice, it did not contest the rescission within 20 days of

receipt of the notice or at any time thereafter.  *See McKenna*, 475 F.3d at 422 (noting that during

TILA's 20-day response period, "the creditor may comply with the [rescission] request, resist

---

[20] The Eleventh Circuit has taken a different view, interpreting § 1635(b) and Regulation Z to make rescission automatic upon notification.  *Williams*, 968 F.2d at 1140-42 (holding under § 1635(b), when the consumer notifies the creditor of his intent to rescind, "[t]he [loan] agreement is then automatically rescinded and the creditor must, ordinarily, tender first," and noting 12 C.F.R. § 225.23(d) reaffirms "the Act's intent to make rescission automatic upon notification").  Although the court in *Williams* observed "there is no such thing as conditional rescission" under TILA, the court went on to hold the discretion the statute and regulation give the courts to modify the process of effecting rescission permits a court to "impose conditions that run with the voiding of a creditor's security interest upon terms that would be equitable and just to the parties in view of all surrounding circumstances."  *Id.* at 1142.

rescission entirely, or agree to rescission while seeking equitable modifications").

As the parties acknowledge, case law addressing the consequences of a consumer's exercise of the right to rescind within the initial three-day "cooling off" period is sparse.  Recently, however, a panel of the United States Court of Appeals for the Ninth Circuit held a district court lacked authority to modify TILA's default rescission procedures where, as here, the consumer "effectively invoked his absolute right to rescind the transaction within three business days of the loan closing" and the creditor "ignored the . . . rescission notice and proceeded to fund the loan."  *Causey v. U.S. Bank Nat'l Ass'n*, No. 10-56021, 2011 WL 6881787, at *1 (9th Cir. Dec. 29, 2011).  The court of appeals recognized district courts generally have discretion to modify the statute's default sequence, but held such authority ends once rescission is accomplished.  *Id.*  In a contested case, "where the creditor disputes the consumer's asserted ground for rescission, rescission is not accomplished until a court determines that the consumer had the right to rescind."  *Id.*  Where the consumer timely mails a rescission notice and the creditor fails to dispute it within the 20-day response period, however, rescission is accomplished automatically, "triggering the default sequence under the regulations." *Id.*  The Ninth Circuit thus held the district court had erred in denying rescission based on the consumer's inability to tender, and directed the court on remand to "order that the [creditor] release its lien on the [consumer's] home and determine the amount that the [consumer] must then tender to the [creditor]."  *Id.*[21]

---

[21] One court in this district has reached a similar result, denying a creditor's motion for summary judgment on a rescission claim based on a factual dispute as to whether the borrowers validly rescinded the loan within three days of the closing, and suggesting if the borrowers did rescind, then "their loan agreement became void, and their later acceptance and retention of the loan proceeds would have no impact whatsoever on their right to enforce the rescission in court."  *Stump*, 2005 WL 645238, at *10.

The court's holding in *Causey* that rescission is accomplished automatically where the creditor fails to dispute a timely rescission notice within the 20-day response period makes particular sense in the context of a rescission notice sent during the initial three-day cooling off period because the consumer's right to rescind a transaction is unconditional during this period.  So long as the notice is timely, the creditor has no discretion not to honor it because the consumer may rescind "for any reason or for no reason."  *McKenna*, 475 F.3d at 421.  In fact, to ensure rescission within this three-day period is honored, Regulation Z places the burden on the creditor to ensure a loan has *not* been rescinded before disbursing the loan proceeds.  Unless a consumer waives the right to rescind in writing, the creditor is prohibited from disbursing any funds, other than in escrow, "until the rescission period has expired *and* the creditor is reasonably satisfied that the consumer has not rescinded."  12 C.F.R. § 226.23(c) (emphasis added).  A creditor may satisfy itself a consumer has not rescinded by either "[w]aiting a reasonable time after expiration of the rescission period to allow for delivery of a mailed notice" or "[o]btaining a written statement from the consumer that the right has not been exercised."  12 C.F.R. pt. 226, Supp. I ¶ 23(c)(4).  The nature of the three-day rescission right and the regulations designed to protect it thus suggest rescission may be accomplished automatically, at least when the creditor fails to dispute a timely three-day rescission notice within 20 days of receiving it.[22]

---

[22] Although WMC argues the statute and regulations do not distinguish between the right of rescission within the first three days and the extended, three-year rescission right, rescission serves a different purpose in each context.  By making rescission available as a remedy when a creditor has failed to make the required disclosures, the extended right of rescission gives lenders an incentive to comply with TILA's disclosure requirements and thus serves the statute's goal of "assur[ing] a meaningful disclosure of credit terms" and "protect[ing] the consumer against inaccurate and unfair credit . . . practices."  *Cappuccio*, 649 F.3d at 188 (quoting 15 U.S.C. § 1601(a)).  The initial three-day rescission period, in contrast, gives the consumer a period of time in which he may change his mind about the transaction, even if all appropriate disclosures have been made.

Ultimately, however, this Court need not decide whether it retains discretion to condition rescission on tender here because even if this Court does retain such discretion, the Court is not persuaded it would be equitable to condition rescission on tender in the circumstances of this case.

In determining whether rescission should be conditioned on tender, a district court should consider the equities of the particular case, including the severity of the creditor's TILA violation and whether the consumer has the ability to repay the principal amount. *Williams*, 968 F.2d at 1142; *see also Yamamoto*, 329 F.3d at 1171; *Ljepava v. M.L.S.C. Props., Inc.*, 511 F.2d 935, 944 (9th Cir. 1975). A court should also consider "the legislative policy of full disclosure that underlies [TILA] and the remedial-penal nature of the private enforcement provisions of the Act." *Yamamoto*, 329 F.3d at 1171 (quoting *Palmer v. Wilson*, 502 F.2d 860, 862 (9th Cir. 1974)); *cf. Williams*, 986 F.2d at 1140 (noting the goals of the statutory rescission process include placing the consumer in stronger bargaining position and returning the parties most nearly to the position they held prior to entering into the transaction). While a court may abuse its discretion in not conditioning rescission on tender where the TILA violations are not egregious and the equities otherwise favor the creditor, *LaGrone v. Johnson*, 534 F.2d 1360, 1362 (9th Cir. 1976), egregious TILA violations require "a more liberal remedy," *Ljepava*, 511 F.2d at 944.

Unlike in many of the cases in which courts have approved the conditioning of rescission upon the consumer's tender, the TILA violation at issue here was particularly egregious. WMC received Bakers' notice of rescission postmarked on the third business day following the loan closing, yet proceeded to fund the loan anyway without ever disputing or even responding to the notice. In doing so, WMC not only violated its obligations under the statute and regulations, but also placed the Bakers in a position in which they could not unwind the transaction on their own because

they had no control over the bulk of the loan proceeds, which had been disbursed directly to their prior mortgage and home equity lenders.  Although WMC argues it funded the loan based on a good faith belief the Bakers wanted to proceed with the loan, there is no credible, admissible evidence this is true.  Significantly, moreover, WMC's asserted good faith belief is based on its questionable practice of having the broker of a loan—whose own financial interest is in ensuring the transaction goes through—follow up with the consumer upon WMC's receipt of a rescission notice.

As to the Bakers' ability to repay the loan principal, there is reason to doubt the Bakers will be able to make a lump sum tender of the loan funds.  At trial, Mr. Baker acknowledged the Navy Federal Credit Union obtained an almost $10,000 judgment against him for nonpayment of a loan in 2007, and also stated that other creditors have pursued him in the last six years.  Tr. vol. 1, 242-44.  Mrs. Baker explained she cashed a replacement check for approximately $18,000 of the loan proceeds in 2007 on the advice of counsel because she and her husband needed the money to pay their lawyer to defend the foreclosure action and for other expenses.  *Id.* at 222; Tr. vol. 2, 223-24.  Moreover, the Bakers do not appear to have been consistently employed since the loan closing.

Although this Court is mindful "the goal [of rescission] should always be to 'restor[e] the parties to the status quo ante,' rescission must also maintain its vitality as an enforcement tool." *Williams*, 968 F.2d at 1142 (citations omitted); *see also Ljepava*, 511 F.2d at 944 ("Under [TILA] a court should be concerned that [lenders] ultimately receive the money they advance under a loan agreement, but it must be careful that such concern does not provide lenders with a method of frustrating the main purpose of the Act, which is to allow rescission.").  The purpose of the three-day cooling off period is "to give the consumer the opportunity to reconsider any transaction which would have the serious consequence of encumbering the title to his home."  S. Rep. No. 96-368

30

(1979), *reprinted in* 1980 U.S.C.C.A.N. 236, 264.  Where, as here, loan proceeds are to be disbursed

to third parties rather than to the consumer, the right to rescind during this period is meaningful only

if creditors scrupulously honor timely rescission notices, since once the loan proceeds are disbursed,

the transaction cannot be easily reversed.  The TILA regulations recognize this, prohibiting the

creditor from disbursing the loan proceeds until it is reasonably satisfied the consumer has not

rescinded.  Permitting a creditor to ignore a timely three-day rescission notice and still obtain the

benefit of equitable modification of TILA's rescission procedures would effectively eliminate the

cooling off period for consumers without easy access to alternative funding, and would eviscerate

the effectiveness of rescission as an enforcement tool.  On balance, the Court is not persuaded the

equities favor modification of TILA's default procedures here, given the egregiousness of WMC's

violation.  Thus, in the unusual circumstances of this case, this Court sees no reason to depart from

the statute as written.[23]

     Because the Bakers exercised their unconditional right to rescind the loan within the first

---

[23] WMC cites two cases in which courts have held rescission of a loan should be conditioned on the borrower's tender of the loan funds, even when the borrower submitted a rescission notice within the initial three-day cooling off period.  In *Avelo Mortgage, LLC v. Jeffery*, 2010 WL 2795050, at *5 (N.J. Super. Ct. App. Div. July 15, 2010), the court held unconditional rescission was an inappropriate remedy because the borrowers could not tender the loan funds, and suggested the trial court should instead consider reforming the mortgage if the borrowers could show they had agreed to different loan terms than those reflected in the note.  In *In re Miller*, 320 B.R. 203, 212 (Bankr. N.D. Ala. 2005), the court held it would be appropriate to condition rescission on tender so the parties would be "most nearly returned to their respective pre-transaction positions."  These decisions, however, give no weight to the egregiousness of the creditor's TILA violation or the need to retain the vitality of rescission as an enforcement tool, factors which give this Court reason to reach a different conclusion here.  WMC also cites *Consumer Solutions REO, LLC v. Hillery*, No. 08-4357, 2010 WL 144988, at *7 (N.D. Cal. Jan. 8, 2010), in which the court suggested rescission of a loan could be conditioned on return of the loan proceeds, even though the borrower had timely submitted a three-day rescission notice, but *Hillery* was decided before the Ninth Circuit reached the opposite conclusion in *Causey*.

three business days following the loan closing, and because modification of TILA's rescission provisions is not warranted, WMC's security interest in the Bakers' property is void.  WMC must take any action necessary or appropriate to reflect the termination of its security interest.  Upon WMC's performance of this obligation, the Bakers must tender to WMC the loan funds, less any amounts disallowed by TILA, or property of equivalent value.

The Bakers argue WMC forfeited any right to return of the loan funds by failing to comply with its obligations under TILA upon receipt of their timely rescission notice.  In support of this argument, the Bakers cite § 1635(b), which provides, in relevant part:

> Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor.  If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it.

The Bakers argue this provision means that if the creditor fails to perform its obligations within 20 days of receiving a rescission notice, the consumer may keep the loan proceeds.  But the statute itself permits such a result only when the consumer has tendered back the creditor's property and the creditor has failed to take possession of the property within 20 days.  15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(3) (providing if the creditor does not take possession of money tendered by the consumer at the creditor's designated business "within 20 calendar days after the consumer's tender, the consumer may keep [the money] without further obligation").  Although there is some support for the proposition that a creditor's failure to respond properly to a rescission request "obviates the consumer's [tender] obligation," *Gill v. Mid-Penn Consumer Disc. Co.*, 671 F. Supp. 1021, 1026 (E.D. Pa. 1987), *aff'd without opinion*, 853 F.2d 917 (3d Cir. 1988), the majority view is that "an

32

obligor must tender or offer to tender the proceeds of the consumer transaction before finding a forfeiture," particularly in the absence of evidence of fraud or deceit by the creditor, *Mayfield v. Vanguard Sav. & Loan Ass'n*, 710 F. Supp. 143, 147-48 (E.D. Pa. 1989); *see also Bustamante v. First Fed. Sav. & Loan Ass'n of San Antonio*, 619 F.2d 360, 364-65 (5th Cir. 1980) (holding TILA's forfeiture provision is not triggered until the debtor tenders the loan proceeds).  Thus, because the Bakers never tendered or offered to tender the loan funds to WMC, there is no forfeiture.[24]

WMC's remaining claims are framed in the alternative to its claim for a declaration regarding the Bakers' obligations under TILA.  In the event the Court determines the Bakers did not rescind the loan, WMC seeks a declaration they are in breach of the loan and damages for breach of contract or under a theory of unjust enrichment.  Compl. ¶¶ 27-2[9].  Because this Court finds the Bakers rescinded the loan and must therefore return loan proceeds after WMC terminates its security interest, the Court need not address WMC's alternative theories.

**B.     The Bakers' Counterclaims**

As set forth above, WMC violated TILA by failing to honor the Bakers' timely submitted rescission notice and by disbursing the loan proceeds notwithstanding its receipt of the rescission notice.  Under 15 U.S.C. § 1640(a), WMC is thus liable for actual and statutory damages.  *See Belini v. Wash. Mut. Bank, FA*, 412 F.3d 17, 25 (1st Cir. 2005) (holding a creditor that fails to take steps required by § 1635(b) within 20 days of receiving a valid rescission notice "has generally violated a 'requirement' of section 1635 and can be held liable for damages under section 1640"); *Smith v.*

---

[24] The Bakers also argue WMC forfeited any right to return of the loan funds under its own Notice of Right to Cancel, but the Notice also requires the consumer to offer to return any money or property received from the creditor after the creditor has performed its obligations, and contemplates forfeiture by the creditor only if it fails to take possession of the money or property within 20 calendar days of tender.  Ex. D-1.

*Fid. Consumer Disc. Co.*, 898 F.2d 896, 903 (3d Cir. 1990) (recognizing a consumer's entitlement to statutory damages under § 1640 for a creditor's wrongful denial of a request to rescind); *Horton v. First State Bank of Eldorado*, No. 05-4101, 2006 WL 328172, at *5 (S.D. Ill. Feb. 9, 2006) (recognizing a consumer's entitlement to statutory damages for a creditor's premature disbursement in violation of 12 C.F.R. § 226.23(c)).[25]

Where, as here, TILA violations occur in connection with a credit transaction secured by real property, § 1640 permits statutory damages in an amount "not less than $200 or greater than $2,000." 15 U.S.C. § 1640(a)(2)(A)(iii).[26]   The Bakers seek statutory damages of $2,000 each, for a total of $4,000.   Defs.' Proposed Findings 38, ¶ 134.   Because the statute permits only one recovery of statutory damages in a case with multiple obligors, however, this Court will award the Bakers a total of $2,000 in statutory damages.   15 U.S.C. § 1640(d).

The Bakers also seek actual damages of $6,500, the amount they had to pay an attorney to defend the foreclosure action that was initiated as a result of WMC's improper failure to honor the rescission.   TILA permits consumers to recover actual damages sustained "as a result of" a creditor's failure to comply with the statute's requirements.   *Id.* § 1640(a)(1).   Here, WMC's TILA violations caused the Bakers to incur expenses in connection with the foreclosure action, which would not have

---

[25] Although claims under § 1640 must generally be brought "within one year from the date of the occurrence of the violation," this limitations period does not apply where TILA violations are asserted "as a matter of defense by recoupment or set-off" in an action to collect the debt. 15 U.S.C. § 1640(e).

[26] Although Congress amended TILA in 2008 to "increase[] the statutory damages range to $400 to $4,000," *Palmer*, 2010 WL 3933273, at *18 n.4, the Bakers seek statutory damages in the pre-amendment maximum amount of $2,000, presumably because WMC's TILA violations occurred prior to 2008. *See id.* (holding the pre-2008 statutory damages provision governs where violations took place before the 2008 TILA amendments).

been instituted if WMC had honored their rescission notice, as it was legally required to do.  As a result, this Court will also award the Bakers $6,500 in actual damages on their TILA counterclaim.

The Bakers also allege WMC's failure to honor their rescission notice violated the UTPCPL, which prohibits a range of "unfair or deceptive acts or practices in the conduct of any trade or commerce."  73 Pa. Stat. Ann. § 201-3.  Specifically, the Bakers argue WMC violated the UTPCPL by "[f]ailing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made," *id.* § 201-2(4)(xiv), and by "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," *id.* § 201-2(4)(xxi).  *See also id.* § 201-3 (declaring unlawful the acts and practices set forth in § 201-2(4)(i)-(xxi)).  The Bakers also argue WMC violated the UTPCPL's door-to-door sales provision, which gives consumers a three-day right to avoid a contract for the sale of goods or services priced at $25 or more, where the contract is entered into "as a result of, or in connection with, a contact with or call on the buyer or resident at his residence either in person or by telephone."  *Id.* § 201-7(a).  Under this provision, a seller must honor any valid notice of cancellation within ten business days after its receipt.  *Id.* § 201-7(g).  The Bakers seek damages for WMC's alleged UTPCPL violations pursuant to § 201-9.2, which provides a private cause of action to

> [a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of th[e] act, [73 Pa. Stat. Ann. § 201-3] . . . .

*Id.* § 201-9.2 (footnote omitted).[27]

By entering into a loan to refinance the mortgage on their home, the Bakers contracted to purchase services in excess of $25 primarily for personal, family, or household purposes within the meaning of the UTPCPL.  *See Christopher*, 2008 WL 1815300, at *9 (holding "the refinancing of mortgage loans constitutes a 'service' under the UTPCPL").  Moreover, because the loan closing occurred at the Bakers' home, the transaction was entered into "as a result of, or in connection with," in-person contact between WMC (through the broker) and the Bakers, for purposes of the UTPCPL's door-to-door sales provision.  *See Tellado v. Indymac Mortg. Servs.*, No. 09-5022, 2011 WL 3495990, at *4 (E.D. Pa. Aug. 8, 2011) (holding mortgage loan refinancing services were contracted as a result of contacts between borrower and lender at borrower's residence where borrower called lender from his home and the loan closing occurred at borrower's home); *Burke v. Yingling*, 666 A.2d 288, 291 (Pa. Super. Ct. 1995) (holding where seller engaged in repeated contact with buyer at his home regarding buyer's purchase of a customized audio visual system, the sale "either resulted from or was consummated in connection with those contacts"); *cf. St. Hill v. Tribeca Lending Corp.*, 403 F. App'x 717, 721 (3d Cir. 2010) (finding door-to-door sales provision inapplicable to mortgage refinance loan where loan closing was held at the borrower's home office for the borrower's own convenience, as it was her principal place of business).  As a result, the door-to-door sales provision applies to the loan transaction at issue in this case, and WMC was required to honor the Bakers'

---

[27] Although by its terms, the UTPCPL's private action is limited to violations of § 201-3, the Pennsylvania Superior Court has interpreted the private action provision to extend to violations of the door-to-door sales provision, § 201-7, as well.  *Culbreth v. Lawrence J. Miller, Inc.*, 477 A.2d 491, 500-01 (Pa. Super. Ct. 1984); *see also Christopher v. First Mut. Corp.*, No. 05-0115, 2008 WL 1815300, at *12 (E.D. Pa. Apr. 22, 2008) ("Violations of § 201-7 can be remedied through UTPCPL § 201-9.2." (citing *Culbreth*)).

undisputedly valid notice of cancellation within ten business days after receiving it.  73 Pa. Stat. Ann. § 201-7(g).  Having failed to do so, WMC violated the UTPCPL.[28]

As set forth above, the Bakers suffered an "ascertainable loss of money" as a result of WMC's failure to honor their rescission notice in that they had to pay an attorney $6,500 to defend the foreclosure action.  Although § 201-9.2(a) gives a court discretion to award "up to three times the actual damages sustained," this Court finds treble damages are not warranted in this case.  While WMC's violation in this case was egregious, there is not sufficient evidence in the record for this Court to determine whether the violation was the result of intentional or reckless conduct by WMC. *See Schwartz v. Rockey*, 932 A.2d 885, 898 (Pa. 2007) (holding a court considering whether to award treble damages under the UTPCPL "should focus on the presence of intentional or reckless, wrongful conduct, as to which an award of treble damages would be consistent with, and in furtherance of, the remedial purposes of the UTPCPL").  Accordingly, judgment will be entered for the Bakers on their UTPCPL counterclaim in the amount of $100.  *See* 73 Pa. Stat. Ann. § 201-9.2(a) (specifying a court may not award "less than one hundred dollars" for a UTPCPL violation).

The Bakers are also entitled to judgment on their counterclaim to quiet title to their property at 6370 Del Haven Road, Bangor, Pennsylvania.  Under Pennsylvania Rule of Civil Procedure 1061, an action may be brought "to compel an adverse party to file, record, cancel, surrender or satisfy of record, or admit the validity, invalidity or discharge of, any document, obligation or deed affecting any right, lien, title or interest in land."  Pa. R. Civ. P. 1061(b)(3).  As set forth above, because the Bakers timely rescinded the loan, the Mortgage executed in favor of MERS as nominee for WMC

---

[28] Because this Court finds WMC violated the door-to-door sales provision of the UTPCPL, the Court need not address the alternative violations alleged.

Corp. is void, and, pursuant to TILA, WMC must take all action necessary to reflect the termination of the Mortgage.  Therefore, judgment will be entered for the Bakers on their quiet title counterclaim.

The Bakers also allege WMC's filing of this allegedly time-barred action to collect on the loan violates the FDCPA, which imposes civil liability on "debt collectors" who engage in certain prohibited debt collection practices.  WMC argues the Bakers cannot prevail on their FDCPA counterclaim because the Bakers failed to prove WMC is a "debt collector" within the meaning of the statute and failed to prove WMC violated the statute.  This Court agrees.

For purposes of the FDCPA, a debt collector includes "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  At trial, the only evidence regarding WMC's business activities came from Diane Taylor, who testified WMC is a discontinued operation that has only about 20 employees and is currently in the process of winding down its business.  Taylor further explained the winding down process includes "getting investors documents that they may need in the future," "rebuttaling repurchases," and "helping consumers when they do call in on the 800 line."  Tr. vol. 1, 78.  Taylor was not asked, and did not testify, about WMC's collection activities in this or any other case.[29]

The Bakers speculate that because WMC no longer originates mortgage loans,

> the principal purpose of its business now is to repurchase and collect on defaulted
> loans sold to mortgage securitization trusts and others by its predecessor, WMC

---

[29] While Taylor did not explain what "rebuttaling repurchases" entails, her use of a form of the verb "rebut" suggests it involves opposing repurchases, and thus does not involve any collection activity with respect to repurchased loans.  *See Black's Law Dictionary* 585 (9th ed. 2009) (defining "rebut" as "[t]o refute, oppose, or counteract (something) by evidence, argument or contrary proof").

Mortgage Corp., or to "regularly collect[] or attempt[] to collect, directly or indirectly, debts owed or due or asserted to be owed or due another," e.g. mortgage securitization trusts such as GSAMP 2005-WMC 1 or its predecessor.

Defs.' Proposed Findings 30, ¶ 114.  However, there is no evidence in the record regarding any collection activities by WMC other than in this case.  Absent any such evidence, this Court cannot find WMC regularly collects debts asserted to be due another, much less that such debt collection is WMC's principal purpose.  *Cf. Oppong v. First Union Mortg. Corp.*, 215 F. App'x 114, 119-20 (3d Cir. 2007) (holding a mortgage lender "regularly" collected debts owed to another as a matter of law based on evidence the lender acquired approximately 89 home mortgages that were in default in a typical three-month period).  The Bakers also argue Taylor previously admitted WMC engages in indirect debt collection activities through loan servicers for loans acquired by WMC after default, citing Taylor's affidavit in support of WMC's motion for summary judgment.  But Taylor's statements in the affidavit concern loans retained by WMC after origination.  Taylor Aff. ¶ 10 (ECF No. 32).  As the originator, WMC is not a debt collector with respect to such loans.  *See* 15 U.S.C. § 1692a(6)(F)(ii) (providing a person collecting or attempting to collect "a debt which was originated by such person" is not a debt collector for purposes of the FDCPA).

WMC is also entitled to judgment on the Bakers' FDCPA counterclaim because the Bakers have not shown WMC violated the statute.  The premise of the Bakers' counterclaim is that WMC's service of this action on the Bakers violated the FDCPA because the action is time-barred.  Defs.' Proposed Findings 36, ¶ 127 (arguing WMC violated the FDCPA by serving the Bakers with a time-barred complaint).  As set forth above, this Court concludes WMC's claims are not time-barred; hence, there is no violation as alleged by the Bakers.  Although this Court also concludes the Bakers rescinded the loan and the rescission should be enforced according to TILA's default procedures, this

conclusion does not render WMC's efforts to obtain declaratory relief as to their rights and obligations with respect to the loan unlawful under the FDCPA.  Because the Bakers failed to prove that WMC is a debt collector, or that the filing of this action violated the FDCPA, judgment will be entered for WMC on the Bakers' FDCPA claim.

Finally, the Bakers bring a counterclaim pursuant to the FCEUA, Pennsylvania's counterpart to the FDCPA, which imposes liability on debt collectors for violations of any provision of the FDCPA and on creditors for "engag[ing] in any conduct declared unlawful by [73 Pa. Stat. Ann. § 2270.4(b)], which mirrors the FDCPA's proscriptions." *Gigli v. Palisades Collection, L.L.C.*, No. 06-1428, 2008 WL 3853295, at *11 (M.D. Pa. Aug. 14, 2008).  The Bakers' FCEUA claim is based on the same conduct as their FDCPA claim—namely, WMC's "communication and pursuit of a time-barred claim to attempt to collect a time-barred debt." Defs.' Proposed Findings 37, ¶ 130.  The claim thus fails for the same reason as the FDCPA claim, and judgment will be entered for WMC on the Bakers' FCEUA counterclaim.

An appropriate judgment follows.

BY THE COURT:


   /s/ Juan R. Sánchez
Juan R. Sánchez, J.